GULF REFINING CO. et al. v. FRAZIER.—83 S. W. (2d) 285.

Middle Section. December 8, 1934.

Petition for Certiorari denied by Supreme Court, May 17, 1935.

Thomas B. Finley, of Lebanon, and Walter S. Finley and Trabue, Hume & Armistead, all of Nashville, for plaintiffs in error.

Walter S. Faulkner and Sam Turner, both of Lebanon, and Joseph Higgins, of Nashville, for defendant in error.

FAW, P. J. This is an action for personal injuries, brought in the circuit court of Wilson county, by Robert Victor Frazier, a minor, suing by his father, A. L. Frazier, as next friend, against Gulf Refining Company, a corporation, W. G. Ingram, and R. A. Bridgewater.

· The case has been tried to a jury three times. Each of the first two trials resulted in a verdict of the jury, and judgment of the trial court thereon, in favor of the plaintiff and against the three defendants, for $12,000, but each of said judgments was reversed by this court and the cause remanded for a new trial on account of errors committed at the trial below, and certiorari was denied by the Supreme Court. However, in neither instance was the reversal on the ground that there was no evidence to support the verdict of the jury finding the issue of the liability of defendants in favor of the plaintiff.

· On the third trial (which is now before us for review), the jury reported a verdict of "not guilty" as to defendant Bridgewater, but found the issues in favor of the plaintiff and against defendants Gulf Refining Company and W. G. Ingram, and fixed plaintiff's damages at $10,000, for which sum, and for costs, judgment of the court was rendered in accordance with the verdict.

A motion for a new trial on behalf of the two unsuccessful defendants was made and overruled, and they thereupon reserved exceptions to the action of the court in overruling their motion for a new trial, and prayed an appeal to this court, which was granted by the trial court and perfected by defendants Gulf Refining Company and Ingram.

For convenience, we will designate the parties as they appeared on the record in the trial court—Robert V. Frazier, as plaintiff, and Gulf Refining Company and W. G. Ingram, as defendants.

At the threshold of the investigation of the case, we are met with four motions on behalf of the plaintiff. The first of these motions is to strike the defendants' assignments of error, brief, and argument from the files, for the reason that it entirely omits the address, viz., "May it please the Court." It is said, in the motion, that such address "is an indispensable requirement to every argument, either oral or written, and especially so written when addressing an appellate court, and no pleading will be countenanced that does not show this respect to the Court."

The use of such salutation as thus indicated in the motion, or its

equivalent, is an almost invariable custom of such long standing in oral argument at the bar that its omission might be considered a breach of court etiquette; but this court has not, by rule or practice, required such manner of address in assignments of error, briefs, and written arguments.

 The second motion is to strike the "so-called bill of exceptions" from the record, for the reason that "it only purports to be filed and signed by 'G. W. Alexander' and not by G. W. Alexander, Clerk of the Circuit Court of Wilson County, Tennessee."

The third motion is to strike the "so-called record" in this case from the files of this court because "it only purports to be certified by 'G. W. Alexander, Clerk,' which said Alexander does not appear to be vested with authority to certify to said record."

Appellate courts of this state judicially recognize the public officers of the state under whose laws and organization they act, and this court will take judicial notice of the fact that G. W. Alexander, who certified and attested the record in this case, was the clerk of the circuit court of Wilson county at the time of such certification. Major v. State, 2 Sneed, 11, 15; State v. Cole, 9 Humph., 626, 627; State v. Evans, 8 Humph., 110, 112; Burton v. Pettibone, 5 Yerg., 443, 444.

█ The fourth motion is "to dismiss the appeal and to strike the case from the record" (docket) because "it affirmatively appears that the appeal to this Court was not taken as an appeal in the nature of a writ of error, but, on the contrary, was taken only as a broad appeal, which, in this case, the case being the result of a judgment based on a verdict at law, does not bring the case to this Court for review."

We held on the former appeal of this case (15 Tenn. App., 662, 664), on the authority of cases there cited, that in such case the "appeal" will be treated as an appeal in the nature of a writ of error.

There is no merit in either of the aforesaid four motions, and they are all overruled.

 There is no assignment on this appeal that there is no evidence to support the verdict of the jury, nor an assignment that the trial court erred in overruling the motion of defendants for a directed verdict. The absence of such assignments is, in effect, a concession, for all the purposes of the appeal, that there is material evidence to support the verdict of the jury finding the defendants liable to respond in damages to the plaintiff. But, under the practice obtaining in the appellate courts of this state in a case of this character, the amount of the damages assessed by the jury may be questioned by an appropriate assignment of error, without an assignment that there was no evidence to support the verdict of the jury. 15 Tenn. App., 662, 665.

Although it is now, in effect, conceded that plaintiff suffered personal injuries as the proximate result of negligence of defendant Ingram, while he (Ingram) was driving a truck in the distribution of oil and gasoline for defendant Gulf Refining Company, a statement of the plaintiff's case may be helpful to an understanding of the questions raised by the defendants' assignments of error, and, as a matter of convenience, we will quote from the charge of the learned trial judge to the jury as follows:

"In the outset, Gentlemen of the Jury, and before going into any discussion of the law it is admitted on all sides that an accident did occur and on the Pike mentioned and in September, 1929.

"The plaintiff says that on that day in the early morning of the day, that he was riding in a little Ford car with his father, that he and his father had driven from their home on the way to school, that he was attending at Shop Springs, I believe, and that they had come out on the Highway and turned East, going away from Lebanon and towards Watertown, in the car in which they were riding, described as a little Ford roadster that had been converted into a small truck by addition of a little box on the back of the car. The plaintiff, who it is conceded on all sides, was then about eight years of age, was riding on the seat by his father and it is said for him that Mr. Frazier, his father, was driving the truck at a reasonable and moderate rate of speed and that as he drove along and approached a narrow bridge or culvert in the road that he observed a passenger bus coming, that is Mr. Frazier did, father of the boy, coming, meeting him from the east going towards Lebanon and that he observed that if he continued to travel at the rate he was going that they might possibly meet on this narrow bridge and Mr. Frazier as a matter of precaution slowed up his car to allow the bus to pass over the culvert, or bridge before he arrived at the bridge in order to avoid his car being possibly in a dangerous position on the bridge. It is said for the plaintiff that there was following Mr. Frazier's little truck, or car, an oil truck, being driven by defendant Ingram, which had come out on that morning from the plant of the Gulf Refining Company in Lebanon operated by defendant Bridgewater. It is said that the defendant, Gulf Refining Company, had a distributing station, for petroleum products in Lebanon at the time. Plaintiff says that Mr. Bridgewater was the agent of the defendant, Gulf Refining Company, and in charge of the business of the Gulf Refining Company, as its agent, and that as its agent he had charge and control of the operation of its business here. It is said that about the time that Mr. Frazier slowed up to allow the bus to cross the bridge, before he arrived at the bridge, that this oil truck was thrown against the bus and it is said that there was room enough between the bus and Frazier car for safe passage, some three to five feet, and it is the insistence of the plaintiff that there was plenty of

passing room but not room for three cars abreast, that is the bus, the Frazier car and the oil truck. Plaintiff says that by this collision the Frazier car was wrecked and that the little boy, the plaintiff, was thrown out of the car and beyond the bus some twenty feet to the opposite side of the road and fell against a rock fence and on hard road and sustained the injury that you have heard described during the progress of the trial.

"The particular negligence on which the plaintiff predicates his right to recover is set out in his declaration and I will first read that to you so you will have it before you.

" 'The proximate cause of the injury was the negligence and recklessness of defendants' driver of said truck, in that, on approaching the car in which plaintiff was riding, the driver of the truck of defendants clearly saw or with the exercise of ordinary care could have seen plaintiff's car; could have seen or did see the approaching passenger bus; could have seen that it was great danger to plaintiff and plaintiff's father and their car for the defendants' driver to undertake to pass them at the point where they would meet with said passenger bus. Notwithstanding this imminent and apparent peril, the driver of defendants' truck continued to approach the point at such a reckless rate of speed that when the point of the road became occupied by the car of the plaintiff and the passing bus, he did not stop his car before he forced same into plaintiff's car; defendants' driver's car, at a high rate of speed, ran into plaintiff's car because the brakes on defendants' car, even if they were applied were in such defective condition as they did not check the speed or serve to lessen the violence of the impact. Thus, because of the negligence of the defendants in recklessly running said car at a speed beyond their control at a place and point that they saw was dangerous and running said car in this reckless manner, without serviceable brakes, they recklessly ran their said car into, on and against the car of plaintiff and caused the injuries to him that resulted, wherefore, he brings this suit by his next friend and asks for a judgment of thirty-five thousand dollars and a trial of his cause by a jury.' "

The plaintiff did not ask for a new trial or appeal from the judgment on the verdict in favor of Bridgewater, and the averments on which plaintiff sought a recovery against Bridgewater are not now of any importance.

Through assignments of error, the defendants aver that the judgment of the circuit court should be reversed and a new trial granted them by reason of errors in the record, as follows:

"1. The trial court admitted the testimony of Dr. C. V. Young, a witness for the plaintiff, which was in substance that plaintiff had a serious permanent injury in his left hip resulting from an intracapsular fracture in the hip joint, which the witness admitted was

not disclosed by X-ray pictures or by any condition or symptom of a purely objective nature. The witness admitted that he had been in error in his diagnosis of plaintiff's injury on a former trial of this case, having first thought the injury consisted of a tearing of the muscles or ligaments around the hip joint, but later concluding that there was a bone injury, instead. He reached this conclusion because 'the boy kept limping,' and admitted that he based his present conclusions solely on the fact that plaintiff limped slightly in his left foot as he walked; that he carried his left foot everted; and that he ascended and descended stairs in an abnormal manner.

"The witness was not plaintiff's family physician, and had never treated plaintiff with a view to curing his alleged injury, but examined him merely so that he might be qualified to testify in plaintiff's behalf. Repeated objections were made by the defendants to the conclusions of this witness as to the nature and permanency of plaintiff's injury, which were overruled. This was error because the testimony was incompetent as a matter of law.

"2. The court erred in admitting the testimony of plaintiff's witness, Dr. Robinson, over the objection of defendants, in substance that plaintiff was suffering from an injury to the ligaments around his hip and that this would, in his opinion, result in rendering plaintiff a permanent cripple,—it appearing that the witness was not plaintiff's family physician, and that he had never examined plaintiff for the purpose of treating him, but only for the purpose of qualifying the witness to testify. The conclusions of this witness were admittedly founded almost entirely upon an abnormal manner in which plaintiff ascended and descended stairs, and the reactions of his leg muscles under manipulation.

"3. The trial court erred in permitting plaintiff's witness, Dr. Doak, over the objection of the defendants, to testify that plaintiff was suffering from a permanent injury which would grow worse with time, when it appeared that the witness, although he was the family physician of plaintiff's family, had not treated plaintiff with a view to curing his injury since about three weeks following its infliction, but had made repeated examinations in connection with previous trials of this case, in order that he might be the better qualified to testify in plaintiff's behalf;—it appearing that the witness based his conclusions entirely on subjective symptoms such as stair climbing, limping, and foot eversion discovered during examination.

"4. The trial court erred in permitting plaintiff's medical witnesses (referred to in the three assignments next preceding), one or all of them, to express opinions and give conclusions, over the objection of the defendants, as to the effects and permanency of plaintiff's injuries, or supposed injuries, without stating competent facts as a basis for such opinions and conclusions.

"5. The trial court erred in refusing and failing to charge defendants' special request number four, as follows:

" 'If you should find from a preponderance of the evidence that the plaintiff, Robert Victor Frazier, is a bright and intelligent boy approximately twelve years old, who has made good grades in school, I charge you that he would then be qualified to testify in this case, and I further charge you that the best and most direct and reliable means of proving what activities a person engages in, or what pain or suffering or discomfort a person may experience is by the direct testimony of such person, and I further charge you, that if you should find this plaintiff is qualified to testify, you may take into consideration in considering your verdict this plaintiff's failure to take the witness chair and testify in his own behalf, and his failure to take the stand and so testify should be considered as evidence that his testimony would be unfavorable to his claims in this case.'

"6. The trial court erred in not sustaining defendants' motion for a new trial, or else in not requiring a substantial remittitur, upon the ground that the verdict and judgment was so excessive as to evince passion, prejudice or caprice on the part of the jury."

It is shown, without dispute, that plaintiff's health and physical condition were entirely normal and unimpaired prior to the time of the injuries of which he complains in this case.

It is also an undisputed fact that plaintiff suffered injuries to his person as a result of the collision described in plaintiff's declaration. He was thrown, by the force of the impact, to the opposite side of the highway, a distance of 20 feet and against a rock fence. He was picked up immediately after the collision, and at that time his hand and foot were bleeding, his pants were bloody, and he "complained of his hip hurting." He was carried to Greenwood Store (about a mile distant) where Dr. Doak (the "family physician" of plaintiff's father) examined him and "found him with his left hip, left thigh bruised, the skin torn on it, his hand lacerated and some place about the left side of his head lacerated," but no bones broken.

Plaintiff was then taken to his father's home where Dr. Doak treated his wounds with antiseptics to keep down inflammation, and put him to bed, with instructions to keep him quiet and keep him in bed about three weeks. Dr. Doak visited plaintiff for four or five days immediately following plaintiff's injury, continuing the treatment to reduce inflammation in the injured parts, and it does not appear that plaintiff has had any medical or surgical treatment since that time.

Within three weeks, or a little less, plaintiff resumed his regular attendance at the Shop Springs School, about three or three and one-half miles from his home—frequently riding horseback to school—where he has since attended during the regular sessions, making good grades in his classes and engaging in the usual games and sports of the school playground, and, among other things, "playing baseball."

Prof. Hayes, principal of the Shop Springs School, testified that he had noticed that plaintiff limps when he walks and that on several occasions when the "physical education" exercises were "very strenuous" he had excused plaintiff from such exercises upon plaintiff's request.

Miss Ida Cason, a teacher at the Shop Springs School, testified that she had noticed plaintiff in his play; that in running he cannot keep up and when he tries to run he drags his left limb; that he cannot go up steps or get in his buggy in the right way; and that when playing his guitar he would not cross his left leg over his right leg as he was instructed to do (explaining that "he could not do it, it would hurt his leg"); but that she had not observed that plaintiff's left foot "has a tendency to turn out."

Roy Alexander, janitor of the Shop Springs School for ten or twelve years, testified that since plaintiff's accident "he has not been like he use to be," in that he limps and "in going up and down steps he does not run like the other children;" that "he goes up sideways and the leg that is not hurt he brings that up first and drags the other one up;" and that he acts like one foot (presumably meaning one leg) is a little shorter than the other.

A. L. Frazier, plaintiff's father, testified that since the injury in question plaintiff "has not been the same;" that his nervous system "seems to be wrecked;" that "he limps and complains constantly and of mornings he is stiff and cannot get about;" that he does not use his left leg like the other one, but "throws it out when he walks" and "does not have control of it;" and that when he undertakes to do those things that "call for stooping," he gives out right away.

Mrs. A. L. Frazier, plaintiff's mother, testified that plaintiff turns his foot out and limps when he walks; that if he "goes through any exercise to any amount" in the daytime he is stiff from it at night; and that his condition is growing "worse."

Miss Elizabeth Baliff, a cousin, who has been living as a member of the family of plaintiff's father for six or eight years, testified that plaintiff is "crippled" and "suffers a good deal from the trouble in his hip and leg, but she says she 'can't express what the trouble is;' that plaintiff limps and his foot 'turns out;' that she don't see that plaintiff is getting any better and don't know whether he is worse or not; that plaintiff plays ball with his brother, works some and milks cows."

The foregoing testimony was admitted without objection, but these lay witnesses could not, and did not undertake to state the pathological condition which caused plaintiff to limp, to evert his left foot, to go up and down stairs in an abnormal manner, etc. (if they were so caused), or whether or not plaintiff's symptoms which they thus described would be permanent. These were matters peculiarly within the domain of expert knowledge, to be determined

upon the testimony of properly qualified physicians and surgeons. American National Insurance Co. v. Smith (Tenn. App.), 74 S. W. (2d) 1078, 1081; 3 Jones on Evidence (2 Ed.), sec. 1345, pp. 2457-2459.

Three physicians testified for the plaintiff, Dr. W. T. Robinson, Dr. C. V. Young, and Dr. J. R. Doak, and one for the defendants, Dr. H. M. Tigert.

Dr. Robinson, a graduate physician in active practice since 1915, testified that he had examined the plaintiff in August, 1931, and again during the trial now under review (July, 1933); that the latter examination was made with Drs. Young, Doak, and Tigert; that plaintiff "is well developed for a boy of his age and he is normal in every respect except as pertains to the left hip and leg;" that when he examined plaintiff in August, 1931, there was a "grating" ("crepitation") in the left hip joint; that on the last examination he did not find the "grating" in the joint, but that "the same evidence of tenderness and restriction of motion was present," and, as he remembered the symptoms of the two examinations, "if there was any difference at all, the leg is weaker now than then; that plaintiff's left leg is normal in length, circumference and development as compared with his right leg, and there are no indications of atrophy;" that since the grating in the joint has disappeared, it is now the opinion of the witness that "this weakness" (in plaintiff's left thigh or hip) "is due to the tearing, or rather a stretching of the ligaments and tendons which go to make up the hip joint," which might result from "any severe traumatic injury," such as being thrown from a car some 15 or 20 feet and landing on a hard substance.

With reference to the question of the permanency or nonpermanency of plaintiff's injuries, Dr. Robinson was asked and answered, on direct examination, as follows:

"Q. In your opinion what will be the result of this injury to this boy's hip? A. My line of reasoning is this, we all recognize the recuperative powers of youth are greater than that of old age, but since practically four years have elapsed and there has been no improvement in that time, except of the traumatic arthritis, that grating I spoke of, those signs have disappeared, and it is my opinion that as much recovery has taken place as will take place.

"Q. Do you or not think it permanent? A. I think it permanent.

"Q. Doctor, tell the court and jury this, as these ligaments are drawn, or torn and not well yet, what would likely be the result when this boy gets heavier, puts on more weight, more weight upon this member? A. As he grows older I think one or two things will happen, either he will get better or as he puts on weight the condition will become more noticeable and it is my opinion that the latter, that is the lameness, will become more noticeable as he grows older is the most probable.

"Q. Most probably that he will become more lame? A. Yes.

"Q. In that left limb? A. Yes.

"Q. Is there any way to be absolutely sure of it? A. No way in the world, only time can answer that question.

"Q. To what extent, I want to know, with the disappearance of the inflammation of that local condition that produces the inflammation would not the normally, natural healing set in, that is the effort on the part of nature to restore it? A. I think there has been an effort on the part of nature, as evidenced by the disappearance of the grating of which we spoke. I think nature has done that much during this time, the two years intervening between my examinations.

"Q. The fact that nature has cleared the inflammation or that condition, and consequently the natural effort to heal has set in and considering he is a youth and yet it has not rectified it, it is probable or more probable that it will last through life, he will go through life as a cripple? A. That would be my interpretation of these symptoms, that nature has done as much as it is going to do in repairing that injury.

"Q. As he grows heavier, what would, in your opinion, be the result? A. In my opinion it is more likely to increase his lameness than to improve his lameness.

"Q. Doctor if these muscles or ligaments that hold together the limb and the body and make it function naturally are torn, what effect would that have upon his walking, his locomotion and his operation of that foot? A. In my opinion it would have the effect that it has had in this case.

"Q. What's that doctor? A. A weakening in the joint, muscles intact but when he applied the force he does not get results he does in the other leg.

"Q. Would that make him throw his foot out or not? A. How is that?

"Q. How does his foot go? A. Out.

"Q. With that condition, if as you stated to his Honor and the jury, upon the accumulation of more weight and if it did not heal and nature did not rectify would it or would it not be accompanied in the future, with accumulation of weight, would it or not be accompanied by pain, I mean in exertion? A. Yes, without repair of the injury now existing I think the more weight placed on it the more painful the act of walking would be.

"Q. If this condition remains as you have found it on these two examinations and the boy grows to a man and accumulates weight will it or will it not interfere and prevent him from exercising the same, pursuing the same exercise that a man normally pursues? A. In my opinion it would.

"Q. I believe I will ask you to the extent of how badly crippled

may it place him? A. Well I could not answer that, it all depends upon his vocation as to his degree of disability.

"Q. I know that, I am asking from a standpoint of layman, to what extent of crippled, how badly crippled? A. I would say bad crippled in that kind of classification."

In the course of his cross-examination, Dr. Robinson stated that "eversion of the foot itself is not necessarily a handicap;" that there is now no evidence of traumatic arthritis or bony injury as appeared to him on his examination of plaintiff in August, 1931, and that "only leaves injury to the muscles or ligaments;" that "if you work a sore joint certain muscles will establish that motion, which in language of a trained physician spells pain just as much as if the patient says oh doctor you are hurting my leg;" that stretching of the ligaments is the same character of injury that exists in the case of a sprained ankle; that witness did not know whether the ligaments in plaintiff's hip were stretched or torn, and, as the X-ray would not show it, the only way to "judge about things of that kind is the motion about such joints;" that the only way to "know exactly" whether it was "stretching or tearing or what would have been by opening, splitting this and look at it, and, of course, that has not been done."

In explanation of his previous statement that there was "restriction of motion" in plaintiff's left hip, Dr. Robinson testified as follows:

"Q. You said you discovered it was torn, I did not understand you knew he was tender, you felt the tenderness he suffered? A. Yes, in moving that joint time and time again, with his mind diverted invariably on rotation, rotation in turning that foot in and bringing the knee towards the midline, as soon as that thigh was moved these muscles in the hip would grip, which we speak of as muscular resistance and as I explained before our interpretation of this is involuntary reflex of the muscles, trying to splint so to speak, or prevent the moving of that leg would cause pain.

"Q. Doctor we have, I think so far in your examination and to the best of your knowledge and professional belief eliminated at the present time any bony injury, or any traumatic arthritis and you have stated there is no way to ascertain what injury has been suffered except to split that leg open? A. No way by which I could determine, it will take a man more highly specialized in joint work to make that accurate determination.

"Q. That's very frank Doctor. You have had to arrive at your conclusion from what you spoke of as the tenderness and misdirection of motion, that together with things he could do or could not do with the leg? A. That's right.

"Q. You don't know what he could do or could not do? A. I think I do.

"Q. Do you know whether he can go up stairs or down stairs and did you learn that in that hour and one-half? A. I think a fellow would be a pretty proof (poor) observer and have poor judgment if he could not distinguish between real and feigned disability.

"Q. Tell us how to distinguish between them? A. I can't describe it. . . .

"Q. This is a reflex that could be simulated? A. Could be. ·

"Q. Where is the best evidence that it is not simulated? A. The boy could tell.

"Q. The boy could testify? A. Yes, sir.

"Q. He is old enough to testify? A. Yes, sir."

Dr. Young, a graduate physician with forty years of experience in practicing medicine, examined plaintiff three times. His first examination was made in the spring of 1930, the second in August, 1931, and the last (which was with Drs. Robinson, Doak, and Tigert during the last trial of this case) in July, 1933. It appears from Dr. Young's testimony that, on his first examination (in 1930), he was "certain then" that plaintiff's "large muscles and his ligaments" that "are attached to the bone" and "keep the leg from swinging out too far" were "torn away," and "were tender, sore, and his foot had everted;" that on his second examination (in 1932) he found "crepitation" in the joint which satisfied him that he was wrong in his first diagnosis, and that it was not a "muscular condition."

Dr. Young's opinion based on his third and last examination of plaintiff is stated in his direct examination as follows:

"Q. What do you think the trouble is now? A. I think the injury is in the capsule of the joint and around the capsule.

"Q. Well what difference would that be to what you first thought? A. Well I think this is a more serious injury; and the next time we examined him was in August, I think, '32,—this second trial, and I found this joint that was injured had crepitation and other indications showed it was a trouble in the capsule of that joint, either an empty capsule, the fluids were injured or an injury inside the joint. I don't think that would show in an X-ray because the manipulation of that leg shows that it is in the joint and the authorities, they claim sometimes it does not show.

"Q. To what extent is that injury and will that get well? A. I don't think it will ever get well, think he has got a permanent injury of that hip.

"Q. What extent an injury? A. I think he will always have a crippled leg.

"Q. The fact that it has been four years now and in the condition you saw it this morning, would that indicate getting well or not going to get well? A. It would indicate it was not going to get well. . . .

"Q. Even though he had this crepitus and does not have it now, I will get you to state if .the production of the condition would not still be there? A. Yes, still there, the boy is crippled like he was at that time.

"Q. Did you put him to any, did you give him any practical examination to ascertain certain facts? A. Yes, sir.

"Major Finley: You mean this last time?

"Q. This morning? A. Yes, sir, I did Saturday and then today also, tried him on the movements of his leg. He can evert that leg, it would naturally evert without him trying, but he can't turn it in without raising his hip.

"Q. Could he simulate that? A. No, sir.

"Q. Could he 'possum, put on, simulate that, or does not the force that is used in the inversion, the turning in, automatically as we would say, carry that hip up with it? . . . A. It inverts itself anyway and he can't invert it.

"Q. If it does invert and somebody has to do what? A. They had to hold his toe this morning. If they turned it aloose it would flop over just like this and Dr. Tigert held his foot while they were making the X-rays.

"Q. Held his foot while they were making the X-rays to hold it so it would invert? A. It looked like it would flop over that away involuntary, it would naturally evert itself.

"Q. Why did it do that? A. Because the injury is in that joint, capsule, where the head goes into the socket of the joint.

"Q. You' said something about when he inverted it it raises the hip? A. Yes, sir, I tried it over there today, tell him to invert it, he can do it but his hip will come up.

"Major Finley: Object to that.

"Q. Would that hip come up if he was normal? A. No, sir, the other one does not come up.

"Major Finley: Except to that.

"Mr. Faulkner: Anything what the Doctor said.

"The Court: I don't think he quoted the boy.

"Mr. Faulkner: If he did I would not insist upon it.

"Q. I want to know if by the inversion of that foot, whether by somebody doing it, you, Tigert, or anybody else, or by him doing it, the raising of that hip corresponding with it, could that have been feigned, simulated? A. I don't know whether it could be feigned or not, I don't believe it was because a little boy of that age would not think of doing that. He might be able to do it but I know it was not feigned in my own mind.

"Q. Would the hip come up every time? A. Inverted, it would not be inverted without coming up, it would evert.

"Q. If that limb was normal and not affected as you found it to be, would it evert? A. It would not evert of course.

"Q. Now, Doctor, from these examinations and from what you found and what you told the Court of the condition of the boy what would you attribute his condition to be from, to have arisen out of, caused by? A. From the injury he got.

"Q. From what you have told to the Court of the injury, its condition, how would, how it acts and all this, you don't, you told the Court about it, I will get you to state whether or not the tendency of this condition, would it be to grow better or worse? A. My opinion would be it would grow worse.

"Q. When he gets heavier what would be the result, heavy weight? A. Well, I just don't know whether more weight would make it more liable to increase or not, I could not say about that but I think age would make it grow worse.

"Q. What about when he gets twenty or twenty-five? A. I don't know what age but if this capsule is injured like I think it is he will be liable to have arthritic pain in the joint and he may have acute arthritis in future years and, of course he may not, and if I am right about the injury to this capsule of the joint he is very liable to have that.

"Q. Arthritis? A. Yes, sir."

On cross-examination, Dr. Young stated, inter alia, that if plaintiff "was not crippled in any way," he "would not think there was any trouble." He stated that he thinks "the injury is in the hip bone," and he was then asked if he was inferring this from the fact that plaintiff "turned out his foot," and he replied, "One of the symptoms; not only that, the way the boy walks up and down steps, the way he walks out of line, all of that, the boy is plainly injured to my mind."

Quoting further from Dr. Young's testimony:

"Q. What is the physical evidence today of the injury to that boy? A. Well it is plain he is crippled, his leg everts, his limb and foot.

"Q. How do you know that? A. By trying it out, testing it.

"Q. You say you don't think that is simulated? A. No, sir, I don't think he is simulating.

"Q. Of course could have been? A. No sir, the way we tested this little boy he could not be simulating and I have watched him when he did not know I was noticing him coming up the street and across the street, up the courthouse steps, and being an intricate condition, of course I watched him."

Dr. Doak, a graduate physician of thirty-two years experience in the practice of medicine, was called to attend plaintiff immediately after his injury in September, 1929, and his (Dr. Doak's) diagnosis and treatment of plaintiff's injuries at that time have been hereinbefore stated.

We infer from Dr. Doak's testimony that his first discovery that

plaintiff walked with his left foot "everted" was accidental. He says, "When I first discovered it I noticed him coming down the road, I was near Brown Hill and I noticed his left foot was everted . . . I told his father about it; I told him to bring him to my office, I wanted to examine him, and I found the boy had no power of eversion of everting his foot, if he turned it he would turn his hip." Dr. Doak stated that he had examined plaintiff, in company with Drs. Tigert, Young, and Robinson on the same day he was testifying; that Dr. Tigert gave plaintiff a "very thorough" examination in his (Dr. Doak's) presence; that plaintiff's "ability to climb steps was not as good as it was and had been in the past, his ability to evert his foot does not seem to be any better;" that "he still walks with his limb and his foot everted," and "his injury is worse than it was."

Quoting further from the direct examination of Dr. Doak:

"Q. I will get you to state whether or not the inflammation having left this locality and it having been about four years since he received this injury and this little boy still in the condition that he is in now, is it possible that he will ever be normal? A. My opinion is he will gradually grow worse on account of the weight he will naturally take on and will naturally cause him to limp worse on account of it and you can lay him on his back, he can take the right limb and stick it straight up and the left limb about one-fourth of the way with a slow effort. ·

"Q. Is not it your opinion from being with this boy this morning that he will get normal or worse through life? A. He will never get normal it has been four years.

"Q. To what extent will he be crippled? A. You mean per cent?

"Q. I mean on the scale of ordinary, slight or bad crippled? A. Bad crippled. . . .

"Q. You ought to be fairly well familiar with this little boy and his condition for four years, you have been seeing him off and on, on many occasions when by yourself examining him and when you with this doctor, and other doctors have examined him, state whether or not it was possible for him to have put on, simulated these conditions, from which you detected your knowledge? A. I never at least suspected him of feigning or putting on.

"Q. Was it possible for him to have feigned on those times? A. No, sir.

"Q. Dr. Doak, I will ask you if you practiced in this family before this unfortunate occurrence? A. Yes, sir.

"Q. You knew this little boy? A. Yes, sir.

"Q. State whether or not there has been any change in this nervous condition resulting from this injury? A. State your question again?

"Q. Do you find any change that has affected his nervous condition? A. Yes, sir.

"Q. To what extent? A. He has been sick two or three times since then and he is very nervous boy and you have to give him sedative for other things children don't have.

"Q. What do you attribute that to? A. Continued suffering and undermining nervous system to certain extent.

"Q. May I ask with respect to this traumatic injury may that not have produced this? A. It could have done it.

"Q. Was he in that condition before he received this fall? A. No, sir."

On cross-examination, Dr. Doak stated that it was his opinion, from the symptoms, that plaintiff "had ruptured ligaments;" that the "ligaments that attached around the hip joint" were "torn loose from their attachments;" that there was some atrophy in plaintiff's left leg for a year or two after the injury, but that there is no difference in his legs now; that "there has been some improvement in the muscles," and there is no injury to the bone.

Dr. Doak was asked, "What is the evidence today of disability in that boy?" and he replied, "The condition his hip is in prevents him from walking without a slight limp and his foot everted. . . . You can detect it if you watch it and as he walks along he cannot lift his foot over objects and his inability to go up stair steps he goes up with good foot, going down steps he brings this off and if you make him walk on bad foot when he is walking he can't hold his equilibrium as well as on other foot."

In response to a question as to whether, if plaintiff had pain for a year, would he not likely, as a matter of psychology, or habit, "go on saving that leg," Dr. Doak replied that he did not think he would get over it the minute it happened, but a year's time after that he thought that he would.

Dr. Doak concluded his testimony on cross-examination with the statement that if he saw plaintiff "go down the road running as rapidly as other boys, no limp and as normal as other boys," he would say "nothing was the matter with him."

Dr. H. M. Tigert, a graduate physician and surgeon, with long experience as a hospital surgeon and thirty years as a teacher of medicine, testified on behalf of defendants. Dr. Tigert had examined plaintiff during the trial now under consideration, in company with Drs. Young, Doak, and Robinson. Dr. Howard was also present and took X-ray pictures of the plaintiff's hips and pelvis during the examination.

The substance of Dr. Tigert's testimony with respect to the disclosures made by the "X-rays" is contained in excerpts from his testimony as follows:

"Q. If there was an injury and is an injury to the bone, Doctor,

what do you regard as the best method in your profession to ascertain it? A. For injury to bones in the joint the X-ray is regarded as being the most scientific determination of the type and extent of injury.

"Q. Were these X-rays taken for the purpose of ascertaining whether there was injury to the bone? A. The X-rays taken yesterday I had taken for the purpose of determining whether at this particular time there was any injury to the bones, the bones entering the joint or the joint itself.

"Q. What conclusion did you derive from an examination of those X-rays? A. Conclusion that X-rays made on yesterday that the joint was perfectly normal and the bones uninjured, and I might add that we took pictures of both joints in order that we might compare the healthy normal joint on the right side with the subjective joint on the left side so as to rule out any peculiarities of joint on the left side which might have been confused as joint tissue otherwise.

"Q. Was there anything different in the character of the pictures? A. No, sir, the two were the same except one was the right and one was the left, converse of the other.

"Q. Did you examine those pictures for the purpose of reaching a conclusion as to whether there was what has been called here an intra-capsular fracture, and explain what that is? A. I had the X-ray examination made to determine whether any kind of injury known to medicine that I was familiar with was in the joint. I concluded there was no injury. . . .

"Q. What experience have you had in interpreting X-ray pictures? A. I believe about the last twenty years I have been using X-ray films with very great frequency, I have had experience in all that time and made a study with other doctors and studied many under other conditions.

"Q. Have you any doubt that the two sides are perfectly uniform and alike? A. Not subject to any doubt; to my mind conclusive."

Dr. Tigert stated that he measured plaintiff's legs from his body to his ankles and "found the two limbs equal in every respect;" that he regarded plaintiff as "a very fine little boy;" that he did not "know any little boy twelve years old better developed, better nourished or more attractive" than the plaintiff, then, after stating that he had no doubt that plaintiff's joints are "all right at this time" and "if there is an injury it must of necessity be in the 'soft parts' in and about the joints" (explaining that by "soft parts" he referred to the muscular parts around the joints and the ligaments that pass from one bone to another over the joint), Dr. Tigert stated that the X-ray would disclose injuries to the soft parts "only very vaguely," if at all, and he thereupon described the manner of ex-

amination and tests used to ascertain whether there were any existing defects in plaintiff's left hip.

"Q. What method, then, is there of ascertaining whether that boy in his present condition has any injury of the latter kind? A. Of the soft parts?

"Q. Yes? A. To determine whether he has an injury of the soft parts about the joint, we looked at him backwards, laterally, diagonally, to see whether or not there was any externally apparent difference in the two sides. Of course, we then tested the function of the parts, that is to say, we put him through some voluntary motion that we ourselves carry out to determine whether or not there is any interference with the functioning of any of those parts, for after all, if there is any injury in it he will or we will not be able to make it function like the other.

"Q. What process did you go through to test the soft parts? A. We had the boy to walk and to walk under difficult conditions, under those varying conditions which would develop any disability, that is, walk along slowly on flat surface, to stand on one leg and on the other leg and finally we put the boy on his back and these limbs up in my hands and carried the joints through all motions that he should normally go through and carry out as far as we could to get the results, this away, that away—in other words, carried the muscles through various motions. Of course, there were one or two other tests I did not subject him to, we might have asked him to run; I did not desire him to do that.

"Q. What was the results of the tests? A. I might add we asked the patient—I took him through motions that are passive. I not only used the passive motion but also asked him to do such things as he could. The result was that we did not find any defect in his foot. I defy anybody to see any difference in his feet looking at him; just looking at the child's legs they are apparently of perfectly normal size, possibly some little condition in the hardness of one muscle compared to the other.

"Q. You spoke of the leg? A. The whole lower extremities including thigh and leg with regard to the passive motion, that is, when the boy was lying down there, I took his left leg and left lower extremities, thigh in my hands and carried him through motions. It will go through every one. I can carry the left on through every motion that you can put the right one through, showing no fixed limitation of motion—I mean whereby the muscle was contracted it would not go out, and if relaxed it would go too far—showing that the tension was equal on the two sides. As to the test of active motion, we put him through a number of tests, put his right foot down and I asked him to raise it straight up and apparently he did not raise his left leg or thigh as well as on his right. I asked the boy to stand up and test the support on one

leg and then the other; he could stand well balanced on either one, everted, I asked him to walk up and down lines in the linoleum floor; there were two parallel lines about six inches apart, I guess, about as far apart or might have been a little closer than one naturally walks, and he voluntarily turned in his left toes, he was very co-operative and did well, he could turn, he could walk down it with his toes turned in.

"Q. What is, that is without eversion? A. Yes, and he co-operated with us and would do it not once but several times. I did not ask him to go up and down steps, but had noticed him in going from one building to the other; we had to go up and down steps; he would put his right foot down and then left, right then left, on same step, being inclined to swing his foot out. Now then there might have been something I left out but that is about the full sum and total of my recollection of physical signs. I could add some more, I did make certain the tone of the muscle by testing the reflex. I think, maybe, I ought to explain that here too. If you get a blow on the knee cap, the knee cap being inserted, it will make the muscles pull, patella reflex, it is called. That is the finest sort of test of muscles; this boy's response for tested muscles is good, his muscles are equal on the two sides, which further led me to eliminate any serious injury to the muscles.

"Q. Something has been said here by one of the doctors about you holding his foot? A. I always do that in this kind of picture and I held his toes together with my hands and I asked him one time to turn his toes up but he was rather reluctant about doing it, and Dr. Doak was there then, and the boy was very reluctant about doing it, and that proves his mind was fixed on his injury.

"Q. You were holding his toes not because they turned out but to get the sameness in the picture? A. Not because they turned out but to guarantee the hip bones the same relative position.

"Q. Now, doctor, you have told of the kind of examination you made for the purpose of testing his soft parts; now what conclusion did you arrive at as to their condition and on what did you base it? A. On the physical examination. If I did not know what the boy was complaining of, I could not have found it out by physical examination, and my conclusion was that there was no serious injury in or about the left hip joint by reason of the fact it is shown negative in this X-ray and by reason of the fact that all tests applied to muscles on that occasion showed the muscles equal on the two sides.

"Q. What did that indicate? A. No serious or permanent injury there.

"Q. If there was a disuse by him or comparative disuse by him of any particular muscle and ligament, would that show? A. I took into consideration the fact that the accident happened nearly

four years ago, and that he received some injury at that time I don't question. Just the exact nature of it I am not able to say, but I am of opinion that it was a ligament strain or muscular strain, that is traumatic, arthritis. Traumatic means force and arthritis means joint; at any rate he had something that was apparent and certain. With the lapse of four years, without seeing him then and seeing him now, whatever injury he had he has recovered from now. The joints are all right and that leads me to assume the injury to the muscles or ligaments. No doubt that injury did incapacitate him, and the history that I have that these muscles stretching is the natural results following. It is a fixed law in medicine that whenever a joint is diseased and injured that muscles control that joint and undoubtedly he did have some injury, and as we look at him now the causes are disappearing and I am of the opinion he is improving, and so far as he goes physically I could not tell any difference. I take that history. I think he still has some slight injury but think it will close up because of his youth, and a physical examination does not disclose any sign of injury. That is briefly what I concluded and is as I got it."

On cross-examination Dr. Tigert was asked if he meant to be understood as saying that there is no injury in plaintiff's hip, and that plaintiff "is just feigning the condition he shows." The answers of the witness to this and subsequent questions of similar purport are quite lengthy, and we will quote excerpts therefrom which we think sufficiently disclose his testimony on this subject, as follows: "I don't think that little boy tries to simulate now. I think he once had an injury, he has these two subjective signs; what I think is that the little fellow is subject to a certain amount of mental habit, he has been dragged through these courts and before the jury, and I don't believe I would be able to throw that off. . . . I believe in the first instance the boy had an injury in the ligaments, if not in the hip joint, because the auto struck the car he was in and he was thrown on that hip. The exact nature of that injury I can't determine at this time and I don't believe anyone could go further than to say there was no fracture of the bones, no serious permanent injury to the bone, but it could have been a dangerous injury of the bone. I will add he possibly had the ligaments stretched and contused and I think he truly suffered an injury because his left leg was impaired for a week or two and what nature shows after that is that the boy is greatly improved until the final examination on yesterday, no doctor could take that boy and tell what is the matter with him. It is wonderful how nature takes care of those things in youth, and whatever trouble there was it has greatly disappeared, it has improved. That's my opinion. . . . I have not used the word feigning, I have not charged him with it; now what I have said is that the boy is a

perfectly normal young American, his mind works like others and I know human minds do govern certain things; he had had an injury, he has lost a subjective exercise of the foot. Now then I am simply saying in my opinion eventually they will disappear. . . . The point is, if you, a person walks with their foot everted and the reason is in order to avoid knee action, that is, not to work the muscles, he simply wanted to avoid it because at first there was pain, a boy walks for four or almost four years with his foot everted, physical impression for muscles to be worked as little as possible, it is the natural way, easier way to avoid using it. . . . For example, take a child that is brought up with a person and instill in it to be led to do nothing for itself, that child has a subconscious mental condition. . . . The boy was hurt, he did have an injury and by reason of the injury he carried his foot this everted way, due to this injury, but at the present time his injury is over and his foot he carried it everted for fear of pain, habit, his body would be the same. . . . There is a physical reason, the mind governs the joint, they are governed by the mind; as set out. As said, he had a defined eversion in his foot and subsequent condition thus coupled with that to hinge on; it may be true and I accept your word that he did have a traumatic arthritis back there in the muscles and ligaments, and therefore he at that time walked this way.''

As to whether or not the plaintiff's injuries are permanent, Dr. Tigert was asked and answered, on cross-examination as follows:

''Q. Can you state upon your oath that that boy with certainty will regain absolute use of that limb? A. No sir, if there is anything I want to do it is to be perfectly fair before you and these gentlemen and state what I think I know and state. It is my opinion beyond a reasonable doubt he will, but I can't say for absolute certainty he would.

''Q. It is speculative? A. I simply make that statement, it is speculative to a certain degree but I believe by an overwhelming possibility he will get all right and will be no worse.

''Q. You can't guarantee it? A. I can't guarantee condition of nature.

''Q. You don't know? A. No sir. My honest opinion he will get all right, but I may be wrong but I think very very remotely that I am wrong but it is possible.

''Q. Physicians continuously make mistakes? A. Not many mistakes as to matters of that kind. They do go out and make more mistakes as to speculative matters, of course.

''Q. You could not give assurance, it is just your opinion? A. I am not making that positive statement that it could not be any other way. . . .

''Q. If he has gotten to the condition, Doctor, he is in, as he

gets more weight upon that limb would not that have a tendency to make him more emphatically lame? A. No sir, that's a thing that will equalize itself, as he grows and gains weight, it will not cause it to get worse for the bones will develop, the ligaments and all, that's nature's way of taking care of things, the process it follows.

"Q. Go ahead. A. The bone is the same, it is growing now, the same as the bone on the other side, which we found from the X-rays.

"Q. Do you say to this court and jury, if this little boy has not changed his physical condition, which causes him to do as we have proven here he does, this condition has prevailed for four years, for nearly four years, the lapse of that time, and he a growing child and is not well now, is not that indicative that he will always limp? A. No sir, because I have seen children have limps for a longer period than that time get well. In this instance I find this little boy has had injury, has limped, I think he is getting better can be reasonably assumed, now I say by overwhelming possibility he will get all right."

It is obvious, we think, that all of the assignments of error (hereinbefore quoted) are, in their ultimate effect, directed to matters of evidence relating to the amount of plaintiff's damages. It is quite clear that if plaintiff is not permanently injured the amount of the verdict is excessive. Whether his injuries are permanent or not was, as before stated, to be determined by the jury from the testimony of medical witnesses. Through their first four assignments of error, the defendants assert that the trial court admitted incompetent testimony of plaintiff's medical witnesses, over the objection of defendants and to their prejudice. We have already stated the salient features of the material testimony of these witnesses. Our analysis of their testimony has led us to the conclusion that the record-hypothesis of each of the first four assignments of error is, in the main, correct; that is to say, the opinions of these witnesses were, in large measure at least, based upon subjective and not objective symptoms and conditions, as stated in the assignments.

█ Timely objections were interposed on behalf of defendants to the line of testimony indicated in the assignments, and these objections were repeated at intervals throughout the taking of testimony. It is true that they were not repeated in every instance where such testimony was elicited from a witness, but this was unnecessary. "One ruling on one question is enough, and a repetition of similar exceptions is not to be required, if, indeed, to be tolerated." Louisville & N. Railroad Co. v. Gower, 85 Tenn., 465, 471, 3 S. W., 824, 826; McCormick v. State, 135 Tenn., 218, 230, 186 S. W., 95, L. R. A., 1916F, 382.

█ It may be added that a litigant does not waive his objection to incompetent testimony introduced on behalf of his adversary

by cross-examination to break the force of such testimony given in chief, in the event, as would most usually occur if the witness should on cross-examination repeat or restate some or all of his evidence given on his direct examination. After such evidence has been admitted over his objection, the objector may combat it or meet it, as best he may, by cross-examination or rebuttal evidence without waiving the exception already taken. McCormick v. State, supra, 135 Tenn., 218, pages 231-233, 186 S. W., 95, L. R. A., 1916F, 382.

 Was it competent for plaintiff's medical witnesses to testify that in their opinion plaintiff was suffering from an injury that was permanent and would grow worse as he grew older, when such opinions were based upon their observations that in walking plaintiff limped and everted his foot, and that he ascended and descended stair steps in an abnormal manner?

In the opinion of this court on the second appeal of this case (15 Tenn. App., 662, 683-688) it was held that the trial court erred in permitting a medical witness for plaintiff to place the plaintiff (an intelligent boy, then about ten years of age) on a table in the presence of the jury and have him to make various demonstrations with his legs and feet, and to answer questions put to him by the witness, explaining his claimed inability to make certain movements with his limbs, when the plaintiff was at no time sworn or introduced as a witness in the case.

In the same opinion it was also held (15 Tenn. App., 662, pages 688-695) that the opinion of a medical witness who makes an examination in order to qualify himself to testify as to the physical condition of an injured plaintiff is inadmissible if it is based upon extrajudicial statements made to the witness by the plaintiff or by other persons; and that holding was merely an application to particular facts of the general rule that "a medical observer must base his opinion upon objective rather than subjective symptoms."

If it was error to permit the plaintiff to demonstrate before the jury (without the sanction of his oath) his claimed inability to make certain movements of his limbs without pain, and if it was error to permit the plaintiff's expert medical witness to testify to an opinion based upon oral statements of the plaintiff made out of court, it would seem to be a necessary corollary to such rules that it would be error to permit a medical witness to testify to an opinion based upon actions and conduct of the plaintiff which could be simulated. It was so held by the Supreme Court of Illinois in the case of Greinke v. Chicago City Railway Co., 234 Ill., 564, 571, 85 N. E., 327, 330.

In the Illinois case just cited, the court said:

"The rule, however, is well settled that a physician, when called as a witness, who has not treated the injured party, but has exam-

·ined him solely as a basis upon which to found an opinion to be given in a trial to recover .damages for the injury sustained by the injured party, cannot testify to the statements made by the injured party to him, or in his presence, during such examination, or base an opinion upon the statements of the injured party. [Citing cases.] An expert witness called under such circumstances must base his opinion upon objective, and not subjective, conditions. If, therefore, it would have been improper for Dr. Cox to have inquired of the appellee as to the relative strength of her hands, or as to whether she could use her left leg as well as her right leg, or whether she could walk without dragging her left leg, and it would have been incompetent for him to have given to the jury the result of such interrogation by detailing to them her replies to said questions (as clearly it would have been), we think it equally clear that he could not reach the same result by having her answer his questions by a nod of the head or by the pressure of her hands, or by asking her to sit upon a chair, or to walk, and then giving to the jury the results of his observations.

"The declarations of an injured party as to his physical condition, brought about as a result of injury, are self-serving, and, at the best, hearsay evidence. Statements, however, made by an injured party which form a part of the res gestae, or those made to his physician during treatment, constitute an exception to the general rule, and are admitted by reason of the fact that he will not be presumed to prevaricate at the very instant of his injury or while he is stating his physical condition to a physician from whom he expects and hopes to receive medical aid, nor will he be presumed to feign disease, pain, or distress under those conditions in which he is ordinarily observed by strangers or his friends and neighbors. No such safeguards, however, surround him when he is being examined by an expert whom he has employed to examine him and to give evidence in his case which is about to be tried in court. To permit the injured party, while undergoing an examination by an expert in his employ, by jerks and twitches, by a pressure of his hand, by turning his toes in or by dragging one of his legs when walking, to thus make evidence for himself, and then to permit his expert to go before the jury and bolster up and strengthen by his opinion the self-serving testimony thus manufactured by the injured party, would open up the door wide for the grossest fraud, which might work upon his adversary the most palpable injury. This character of self-serving testimony has been held incompetent by the Supreme Court of Michigan in McKormick v. City of West Bay City, 110 Mich., 265, 68 N. W., 148, and Comstock v. Georgetown Township, 137 Mich., 541, 100 N. W., 788, and the general rule announced by that court is, we think, in entire harmony with the ruling of this court in the numerous cases herein-

before cited, and is the correct rule and the one most conducive to justice. We do not intend to hold, however, that a physician may not be able, from an examination of an injured party, to form and express an opinion as to his physical condition and the probable cause which induced such condition, based upon objective testimony alone, but what we do intend to hold is that a physician who has not treated the injured party, but who has made an examination of the injured party solely with a view to testify as an expert, should not be permitted to express an expert opinion to the jury based upon subjective conditions, and then be allowed to fortify his opinion by stating to the jury acts of the injured party which could have been purely voluntary and under the control of the injured party, and which may rest upon no other basis than the truthfulness of the injured party.''

In Thomas v. Illinois Power & Light Corporation, 247 Ill. App., 378, the plaintiff obtained a judgment of the trial court, upon the verdict of a jury, for $12,000 as damages for personal injuries. On appeal, the appellant did not controvert the charge of negligence, and the court said that there was no question but that there was a liability in so far as the question of negligence was involved. A medical witness for plaintiff, Dr. Levitin, testified that plaintiff's injuries were permanent. Error was assigned upon Dr. Levitin's testimony—it being insisted that he was permitted to base his opinion upon partially subjective and partially objective symptoms, and that an opinion so formed by a physician who had not treated, but merely examined, the injured party shortly before the trial, was not admissible in evidence. After stating that ''there is little evidence of the permanency of the injury aside from what was testified by Dr. Levitin which would justify a verdict for so large an amount as was returned by the jury,'' and describing the manner of the examination and tests made by Dr. Levitin, the court said:

''It will be observed that many of the tests mentioned by the witness Levitin must necessarily have relied either upon the word of appellee, the nod of her head or her manifestations of pain or lack of pain. If such was not the fact, the witness could not have determined the ability of appellee to smell, taste, raise the eyebrows, grasp or extend the fingers, move the big toe, exhibit strength or lack of strength of the fingers or indicate to the witness her ability to distinguish between hot or cold water. If the result of the various tests was not made known to the witness by expression or manifestation of the appellee, then they must have been made known by the action of various muscles the control of which was within the power of appellee. The information given to the witness by the appellee either by word of mouth, nod of head or physical manifestation was as much self-serving as a history of the case would be given when given by her. . . .

"The record discloses that one or more of the physicians testified to the effect that many of the movements and manifestations obtained by Dr. Levitin in his examination were subjective and not objective. Without the testimony of such physicians it is apparent from ordinary experience that many of the responses were in fact subjective. That being true then the question arises, What is the rule? The rule is, as we understand it, that the opinion of a physician who has not treated the injured party but has made an examination shortly before the trial for the purpose of testifying as a witness, when based partially upon subjective and partially upon objective symptoms, is not admissible."

Then, after reviewing a number of reported opinions of the Supreme Court of Illinois, the court said:

"In view of the rule as above announced, the court erred in permitting Dr. Levitin to state his opinions based upon the result of his examinations which involved both subjective and objective symptoms and matters. The testimony of Dr. Levitin undoubtedly had much influence with the jury in arriving at a verdict and in determining the amount of damages as found by them."

In the opinion of this court on the second appeal of the instant case (15 Tenn. App., 662, page 689), we cited the case of Chesapeake & O. Railway Co. v. Wiley, 134 Ky., 461, 121 S. W., 402, 409, to the point made by assignments of error on that appeal, that the opinion of an examining physician based upon oral statements of the injured party is not admissible. However, in the Kentucky case, supra, the court went further and ruled upon the precise question raised by the first four assignments of error on the present appeal, saving, inter alia, "How a party acts under such circumstances is not on a different plane from what he says. A nod, a jerk of the hand, the wink of an eye, or the mobility of a leg under pressure, may all be the voluntary result of the will, as much as the spoken word, and be actuated by the same motive. All subjective evidence furnished by the patient under those conditions is on the same plane." Citing with approval Greinke v. Chicago City Railway Co., supra.

The cases of Broyles v. Prisock, 97 Ga., 643, 25 S. E., 389, and Missouri, K. & T. Railway Co. v. Johnson (Tex. Civ. App.), 67 S. W., 769, cited in the second brief for plaintiff, are in conflict with the ruling of this court on the former appeal of this case, viz., that declarations of the plaintiff to the examining physician are inadmissible, which ruling is now "the law of the case." 15 Tenn. App., 662, page 665.

It is further contended for defendants that the opinions of plaintiff's medical witnesses, that plaintiff is permanently injured and crippled, are not only incompetent because they are based upon self-serving acts and subjective symptoms, but that they are like-

wise incompetent and inadmissible because they ''are founded upon two inferences, one based upon the other.''

The rule of evidence which it is thus sought to invoke is well-founded in point of law. It is a well-established rule that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence, and that one presumption cannot be deduced from another. 10 R. C. L., p. 870, par. 13; note, 10 Ann. Cas., page 1096. ''Inferences may be drawn from established facts, but never from mere presumptions.'' East Tennessee & W. N. C. R. Co. v. Lindamood, 111 Tenn., 457, 473, 78 S. W., 99, 103.

The rule just stated was applied to the testimony of medical witnesses in the case of Wright v. Order of United Commercial Travelers, 188 Mo. App., 457, 174 S. W., 833, 836. The court there said:

''In the instant case, there is no positive and direct evidence that Mr. Wright, the assured, suffered a rupture of an artery, and the evidence to that effect is upon evidence entirely, which, as above said, authorizes the jury to do no more than infer the death resulted from a rupture of an artery. Indeed, the evidence of the physicians is but inference on their part, and therefore a conclusion. Having ascertained the ruptured artery through utilizing first the inference or opinion of the physicians that deceased suffered a ruptured artery, it appears that a second inference is employed in the process of arriving at the verdict to the effect that such ruptured artery resulted from accidental means rather than from a natural cause. Obviously a judgment resting upon inference piled upon inference, may not be sustained.''

It is said in the brief for defendants that ''the uncontradicted proof shows that careful physical examination of plaintiff at this time fails to show any anatomical or physiological evidence of injury. Certain of plaintiff's outward movements under examination are not exactly normal; and from these movements—and from nothing else—plaintiff's experts reason inductively and conjecture as to what bodily strains, lesions or deformities might cause such abnormal movements,—although all usual and approved methods of physical and mechanical diagnosis fail to disclose any cause,—and upon their inference thus drawn, they base another inference that, assuming the condition already inferred, it will continue to exist and will grow worse as plaintiff grows heavier.''

The proposition thus advanced is quite persuasive, especially as applied to the testimony of Dr. Young and Dr. Robinson, but it does not appear that an objection to testimony on this ground was at any time offered in the trial court, or that the attention of the trial judge was at any time drawn to this view of the testimony; hence we will make no ruling upon it here.

Thus far we have discussed the rule that ''a medical observer

must base his opinion upon objective rather than subjective symptoms,'' in its application to the case in hand, without differentiating between any of the three medical witnesses for plaintiff. All that we have said applies without limitation to all the testimony of Dr. Young and Dr. Robinson within the scope of the objection pointed out by the assignments of error, as neither of them treated the plaintiff professionally, but they examined him solely for the purpose of qualifying themselves to testify at the trial of plaintiff's action for damages.

In the opinion of this court on the second appeal of this case, we said:

''Dr. Doak was the family physician of plaintiff's father and was plaintiff's attending physician, whenever he needed medical treatment or advice, from the hour of the collision here involved to the time of the trial. It is true that Dr. Doak had made some examinations of plaintiff recently before the second trial of this case for the purpose of further qualifying himself to testify as a witness, but we do not think it appears that in the course of such examinations he learned anything from statements then made by plaintiff or others that he did not already know from his previous observations and examinations in the course of his professional treatment of plaintiff.''

It should be borne in mind that the above-quoted statement in our former opinion concerning Dr. Doak was made in response to an assignment of error that the trial court erred in permitting Dr. Doak to testify to his opinion of the physical condition of plaintiff based on statements made to him by plaintiff and plaintiff's parents, and it did not appear that his opinion was based on any statements made to him other than those made while he was giving plaintiff medical treatment, in his ordinary professional capacity as a physician, following the collision in September, 1929. The question presented on the present appeal, viz., whether opinions of medical witnesses that the plaintiff is permanently injured are admissible in evidence, when such opinions are based upon acts and conduct of the plaintiff which could have been voluntary and under the control of the plaintiff, was not raised or considered on either of the former appeals.

That part of the testimony of Dr. Doak based on opinion acquired by him (including statements of plaintiff) while treating plaintiff professionally was competent, but he had not treated or been called to treat plaintiff for more than three years before the last trial below. He had participated in an examination of plaintiff immediately before he testified (not for the purpose of treatment, but for the purpose of qualifying himself as a witness), and he testified that the ''atrophy'' of plaintiff's limb and other external physical evidences of injury which were visible on former

examinations had disappeared, and when asked what he found "with respect to his (plaintiff's) condition this morning," he replied, "His ability to climb steps was not as good as it was and had been in the past, his ability to evert his foot does not seem to be any better. He still walks with his limp and his foot everted."

Again, Dr. Doak was asked, "What is the evidence today of disability in that boy?" and he replied that, "The condition his hip is in prevents him from walking without a slight limp and his foot everted," and "You can detect it if you watch it and as he walks along he can't lift his foot over objects and his inability to go up stair steps he goes up with good foot, going down he brings this off and if you make him walk on the bad foot when he is walking he can't hold his equilibrium as well as on the other foot."

It seems apparent that Dr. Doak placed his opinion that plaintiff is suffering from permanent injuries upon the subjective symptoms observed by him at the examination made by him on the day he testified, viz., the plaintiff's manner of walking, the "slight limp," the "everted foot," and the abnormal manner in which plaintiff went up and down stair steps. This view of Dr. Doak's testimony is emphasized by his statement that, "If I saw him go down the road running as rapidly as other boys, no limp and as normal as other boys I would say nothing was the matter with him."

Defendants' first four assignments of error are sustained.

Through their fifth assignment of error the defendants complain of the refusal of the trial judge to give to the jury an instruction specially requested by defendants, which we have previously quoted, but which, for convenience, we here repeat as follows:

"If you should find from a preponderance of the evidence that the plaintiff, Robert Victor Frazier, is a bright and intelligent boy approximately twelve years old, who has made good grades in school, I charge you that he would then be qualified to testify in this case, and I further charge you that the best and most direct and reliable means of proving what activities a person engages in, or what pain or suffering or discomfort a person may experience is by the direct testimony of such person, and I further charge you, that if you should find this plaintiff is qualified to testify, you may take into consideration in considering your verdict this plaintiff's failure to take the witness chair and testify in his own behalf, and his failure to take the stand and so testify should be considered as evidence that his testimony would be unfavorable to his claims in this case."

The trial judge charged the jury that "the plaintiff is shown to be about twelve years old, and to be an intelligent boy. He was therefore competent to testify, and you have the right to take into

consideration his failure to testify as a circumstance in your determination of matters that are or were within his knowledge.''

The general question presented by the fifth assignment, supra, has been considered in a number of reported cases in this state. See Dunlap v. Haynes, 4 Heisk., 476, 480; Citizens' Bank v. Langford, 6 Tenn. App., 238, 242; Jackson v. Blanton, 2 Baxt., 63, 67; Standard Oil Co. v. State, 117 Tenn., 618, 672, 100 S. W., 705, 10 L. R. A. (N. S.), 1015; Fisher v. Travelers' Insurance Co., 124 Tenn., 450, 474, 482, 138 S. W., 316, 321, Ann. Cas., 1912D, 1246; Western Union Telegraph Co. v. Lamb, 140 Tenn., 107, 111, 203 S. W., 752.

In Standard Oil Co. v. State, supra, 117 Tenn., 618, page 672, 100 S. W., 705, 718, 10 L. R. A. (N. S.), 1015, the court said: ''The presumption always is that competent and pertinent evidence within the knowledge or control of a party which he withholds is against his interest and insistence.''

In Fisher v. Travelers' Insurance Co., supra, the trial court charged the jury as follows:

''The failure to call an available witness possessing peculiar knowledge concerning facts essential to the party's cause, direct or rebutting, or to examine such witness as to the facts covered by his special knowledge, especially if the witness be naturally favorable to the party's contention, relying instead upon the evidence of witnesses less familiar with the matter, gives rise to an inference, sometimes denominated a 'strong presumption of law,' that the testimony of such uninterrogated witness would not sustain the contentions of such party in the suit. This rule applies with peculiar force to a party to a suit who refuses to testify, and it is applicable to Dr. Fisher in this case.''

The Supreme Court said that the authorities in this state are directly and forcibly in favor of that portion of the charge above quoted; and that some cases would justify ''even a stronger statement.''

The record shows, without dispute, that the plaintiff was, at the time of the trial under review, a bright. intelligent boy, almost twelve years of age. It is shown by testimony of all the medical witnesses that there was nothing in his physical condition which would prevent him from appearing as a witness before the jury. It appears from the testimony of at least two witnesses—Miss Elizabeth Baliff and Dr. Doak—that plaintiff was in the courtroom, at least at times, in the course of the trial.

We see no sufficient reason which would take this case out of the rule stated in the cases above cited, and the charge given to the jury, that they had the right to take into consideration plaintiff's failure to testify as a circumstance in their determination of matters that are or were within his knowledge, was not all that the defendants were entitled to have charged.

Counsel say in the first brief filed for plaintiff: "What did this child know about the effects of a trauma being eversion or inversion? What would this child know about a fracture of the intra capsular joint? What peculiar knowledge would this child have of the function and operation of the inversion ligaments and eversion ligaments?" It will not be presumed that the plaintiff knew about these things, but the instruction requested and refused would have directed the attention of the jury to the fact (in which we concur) that "the best and most direct and reliable means of proving what activities a person engages in, or what pain or suffering or discomfort a person may experience, is by the direct testimony of such person."

If the plaintiff had testified about these matters last mentioned, his testimony would have afforded a basis for hypothetical questions upon which expert medical witnesses could have predicated an opinion as to whether or not plaintiff is permanently injured.

The defendants' fifth assignment of error is sustained.

██ That part of the sixth assignment that "the Trial Court erred in not sustaining defendant's motion for a new trial," is too general and indefinite to merit consideration. The remainder of this assignment is that the trial court erred "in not requiring a substantial remittitur upon the ground that the verdict and judgment was so excessive as to evince passion, prejudice or caprice on the part of the jury."

In view of our rulings upon previous assignments of error, the record is left without "dependable support" for a remittitur of any particular amount by this court which would cure the errors pointed out. An effort on our part to require such remittitur might, in the present state of the case, work great injustice to the plaintiff.

██ It is correctly stated in plaintiff's second brief that "when two theories are urged, one to the effect that the injuries are temporary and the other that they are permanent, it is within the exclusive province of the jury to determine which theory accords with the evidence."

A new trial will be ordered upon the sole issue of the amount of damages, in order that this issue may be more fully and fairly examined and developed. Kress & Co. v. Sharp, 156 Miss., 693, 126 So., 650, 68 A. L. R., 167, 176.

██ The practice of limiting the retrial on the remand, in a proper case, to the single question of the ascertainment of damages, has been approved in this state. Perkins v. Brown, 132 Tenn., 294, 300, 177 S. W., 1158, L. R. A., 1915F, 723, Ann. Cas., 1917A, 124; Aycock v. Railway Co., 4 Tenn. App., 655, 664; Newberry v. Hamblen County, 157 Tenn., 491, 494, 9 S. W. (2d), 700.

See, also, authorities from other jurisdictions as follows: Kress

& Co. v. Sharp, supra (action for personal injuries); Marshal v. Dalton Paper Mills, 82 Vt., 489, 74 A., 108, 24 L. R. A. (N. S.), 128, 133 (action for personal injuries); Smith v. Whittlesey, 79 Conn., 189, 63 A., 1085, 7 Ann. Cas., 114 (action for personal injuries); Pickett v. W. & W. R. Co., 117 N. C., 616, 23 S. E., 264, 30 L. R. A., 257, 260, 53 Am. St. Rep., 611 (action for wrongful death).

It results that the assessment of damages by the jury, and the judgment of the court for $10,000, in favor of the plaintiff and against the defendants, are vacated and set aside, and the cause will be remanded to the circuit court of Wilson county for a new trial upon the sole issue of the amount of damages which the plaintiff is entitled to recover of the defendants Gulf Refining Company and W. G. Ingram.

The cost of the appeal will be adjudged against A. L. Frazier, the plaintiff's next friend and surety on his cost bond below. 15 Tenn. App., 662, page 704.

The costs heretofore accrued in the circuit court (except the costs incident to making R. A. Bridgewater a party defendant) will be adjudged against defendants Gulf Refining Company and W. G. Ingram.

The costs which may hereafter accrue in the circuit court will await the future judgment of that court.

Crownover and DeWitt, JJ., concur.