IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 1, 2009 Session

**STATE OF TENNESSEE v. LORENZO MYRICK**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-02052    Chris Craft, Judge**

**No. W2008-02190-CCA-R3-CD  - Filed July 7, 2010**

A Shelby County jury convicted the defendant, Lorenzo Myrick, of reckless homicide, a Class D felony, and facilitation of especially aggravated robbery, a Class B felony.  The trial court sentenced him as a Range I standard offender to three years for reckless homicide, concurrent with ten years for facilitation of especially aggravated robbery, to be served in the Tennessee Department of Correction.  On appeal, the defendant argues that (1) the evidence was insufficient to support his convictions; (2) the trial court committed reversible error by improperly commenting on the evidence; and (3) the trial court improperly denied probation.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Joseph S. Ozment, Memphis, Tennessee, for the appellant, Lorenzo Myrick.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Background**

    A Shelby County grand jury indicted the defendant, Lorenzo Myrick, and Carnelious Cunningham on three counts: (1) first degree murder in the perpetration of a felony; (2) first degree premeditated murder; and (3) especially aggravated robbery, a Class A felony.  The

Shelby County Criminal Court, the Honorable Judge Chris Craft presiding, held a trial in August 2008, at which the parties presented the following evidence.

Tammy Vaughn testified that her brother, Darius Mann, was shot in the back of his head during a robbery on July 15, 2005. He died the following day. She spoke with investigators after her brother's death and gave them Nicholas Bedford's name because Mr. Bedford was her brother's best friend but had not been at the hospital before the victim died.

On cross-examination, Ms. Vaughn testified that when she gave the police Mr. Bedford's name, she was unaware that someone identified him as running from the victim's car after the shooting. She said that Mr. Bedford called the victim's family every day to ask about the investigation, and he attended the victim's funeral.

Officer Ricky Davison, of the Memphis Police Department's Crime Scene Investigation Unit, testified that he responded to a shooting call in Pierotti Park on July 15, 2005. When he arrived at the scene, he observed a gold Ford Taurus parked near the tennis court. Officer Davison photographed the exterior and interior of the car. He collected as evidence a cell phone that he found on the ground beside the car and a bloody t-shirt that he found on the driver's floorboard of the car. The court admitted Officer Davison's photographs, the cell phone, and the t-shirt into evidence. Officer Davison testified that he searched the area for shell casings and bullets, but he did not discover any. After the police moved the victim's car to the crime scene garage, Officer Davison processed the car for fingerprints. He lifted fingerprints from the car's exterior on the left rear quarter panel but was unable to lift prints from the car's interior. He sent the fingerprints to the latent print office.

On cross-examination, Officer Davison testified that he arrived at the scene after the paramedics had taken the victim to the hospital. He did not know whether the cell phone and t-shirt were in their respective locations prior to the paramedics' arrival.

The court read a stipulation into the record to which the parties had agreed. The parties stipulated that Officer Davison lifted two palm prints from the victim's car, one of which matched the victim's prints and one of which remained unidentified. The second print did not match either the defendant's or Carnelious Cunningham's prints.

Matthew Kinney, the eyewitness, testified that he saw a gunman shoot the victim in the back of the head. He lived near the Raleigh Community Center in July 2005. He had previously seen the victim swimming at the community center but did not know his name. On July 15, 2005, Mr. Kinney was walking home from the community center when he witnessed the shooting. He testified that he did not get a good look at the shooter, but he did

get a good look at a second man who was inside the car with the victim. He identified a photograph of the man inside the car. Mr. Kinney testified that, after the shooting, the man inside the car ran towards a path in the woods, and the gunman got into a small, dark-colored, four-door car and drove away. Mr. Kinney said the gun was a "small, black caliber." The gunman had a tattoo of a scorpion on his right bicep that was approximately three to four inches long. Mr. Kinney identified photo arrays that the police had shown him on July 17, 2005, and on September 9, 2005, on which he had circled a photograph of the man who ran away from the car. He stated that he thought it was the same person in both photographs. Mr. Kinney testified that he never identified the shooter, but he knew the shooter had worn a white t-shirt and white pants.

On cross-examination, Mr. Kinney testified that the gunman's tattoo was red, orange, green, and blue. Mr. Kinney, upon closer inspection of the two photo arrays, said that he circled different men in the two arrays. He agreed that the police had shown him photo arrays from which he did not make any identifications. He said that had been sure of his identification on July 17, 2005.

On re-direct examination, Mr. Kinney stated that he was "[p]ositive" that the man who ran away from the car was "[n]umber three" on the September 9 photo array, and he had circled the wrong person on the July 17 array.

Following Mr. Kinney's testimony, the defendant, by the parties' agreement, displayed his tattoo for the jurors.

Sergeant Caroline Mason, of the Memphis Police Department, testified that she participated in the investigation of the victim's homicide. She identified Carnelious Cunningham as number three on the September 9 photo array and Nicholas Bedford as number two on the July 17 photo array. She and Detective Eric Hutchison, the case coordinator, obtained cell phone records related to the cell phone found at the crime scene. The records led them to develop Cunningham as a suspect. During the investigation, they also developed the defendant as a suspect. Detective Hutchison contacted the defendant via telephone, and the defendant came in to speak with them on September 14, 2005. The defendant offered to take the officers to the location of the weapon. On September 15, 2005, the defendant took the officers to the north side of Scenic Hills Elementary School, but they did not locate the weapon where he said it would be. Sergeant Mason testified that she did not feel that the defendant wanted to assist them but "was just out there." She suggested that they return to the Criminal Justice Complex, but the defendant requested that they search the wooded area on the south side of the school. In the wooded area, the defendant pointed out the magazine of the weapon. After Sergeant Mason found the weapon, the defendant asked her whether the grip was missing on one side. She testified that the weapon she found was,

in fact, missing the grip on one side. Sergeant Mason identified the handgun she found, and the court admitted it as evidence.

After crime scene officers came to the scene to photograph the weapon, Sergeant Mason, Detective Hutchison, and the defendant returned to the homicide office, and the defendant gave a formal statement. Sergeant Mason said that, prior to giving the statement, the defendant had not implicated himself in the crime. The defendant read an advice of rights form, and Sergeant Mason read it aloud to him as well. He indicated that he understood his rights. The defendant agreed to speak with the officers without an attorney present and signed the form. Sergeant Mason testified that the defendant never asked for a lawyer and that she and Detective Hutchison did not threaten or coerce the defendant into giving a statement.

In his statement, the defendant denied being responsible for the victim's death. He said that Carnelious Cunningham, "[a] friend of [his] that [they had] in custody for the murder[,]" was responsible. He knew that Cunningham had bought drugs from the victim in the past. He had seen Cunningham with a small chrome forty-five caliber pistol that was missing a grip the day before the victim was shot but not anytime after the shooting. Cunningham told him that

> he had robbed an old lady at a mall bank, had money and weed with him, and on the news the next day, [the victim] was killed. [The defendant] questioned him about the gun and he told [the defendant] he was going to throw it away either in the river or in some trees by the a [sic] school.

The defendant said that Cunningham had more than one hundred dollars in cash and what appeared to be a quarter ounce of marijuana. He took the officers to Scenic Hills Elementary School to look for the weapon because that is where Cunningham told him he would throw away the weapon. The defendant said that Cunningham was a member of an organization called J.U.B., which he said stood for "Just Us Brothers." The defendant said he was not a member of J.U.B. but "used to hang out with them." He knew that the victim was a member of the Gangster Disciples and an organization called Network. He did not know of a disagreement between Network and J.U.B.

Sergeant Mason testified that there were "inconsistencies in that first statement relating to the facts as [she] knew them at the time." The defendant gave them a second statement on September 16, 2005. Sergeant Mason said that neither she nor Detective Hutchison threatened or coerced the defendant into giving the statement, and they advised him of his rights prior to taking the statement. The defendant indicated that he understood his rights and said that he wanted to give a second statement because he had not told the truth

in the first statement. The defendant admitted he was present when the victim was shot. He said Cunningham arranged to meet the victim to buy marijuana. They went together to meet the victim. They both got out of Cunningham's black Camry, and Cunningham shot the victim. The defendant ran to Cunningham's house, and Cunningham drove the Camry to his house. Then they went to Cunningham's brother's house, and Cunningham split the money with him. They smoked the marijuana together. Later, Cunningham gave him the gun to dispose of it. He did not get rid of the gun right away. The detectives called to talk to him about the murder, and he threw away the gun at the school the night before he went to talk to the detectives. The defendant said the gun was his cousin's, but he had it before the victim's shooting. He kept the weapon either in his car or his closet, and he gave it to Cunningham the night before the shooting. He knew that Cunningham planned to "[m]ake a stang[,]" which meant "[a]nything as far as robbing, shooting, beating somebody for money or anything." He was standing six to seven feet away from the victim's car when Cunningham, who was standing by the driver's side window, shot the victim in the head. He did not know whether the victim was alive when he left the scene. Cunningham called the victim's cell phone later to see if he was alive. The defendant said that Cunningham shot the victim so he could take the victim's money and marijuana.

On cross-examination, Sergeant Mason testified that the defendant voluntarily came to the homicide office on the morning of September 14, 2005. Detective Hutchison interviewed him, and she assisted the detective. The defendant told them that he could take them to the location of the murder weapon. At 2:00 p.m., she filled out an arrest ticket on the defendant, charging him with first degree murder. Sergeant Mason also completed a forty-eight-hour hold form and presented it to a judicial commissioner so that they could detain the defendant in the jail during their investigation. They took the defendant to the jail at 12:20 a.m. on September 15. Later on September 15, she and Detective Hutchison took the defendant to the school to look for the weapon, and she discovered the weapon at 11:48 a.m. Then, they returned to the homicide office and continued interviewing the defendant. She began taking his first formal statement at 3:56 p.m., and he signed his statement at 6:10 p.m. He gave his second formal statement at 1:44 a.m. on September 16. Sergeant Mason recalled that the defendant's mother came to the office on September 14. She spoke to his mother but could not recall what she said. She did not recall the defendant asking to call his mother. On September 15, she interviewed Matthew Kinney and showed him a photospread that included the defendant's picture. He was unable to identify anyone in the photospread as being involved in the shooting.

Officer Stacy Milligan, of the Memphis Police Department's Crime Scene Unit, testified that she recovered a gun with serial number DEA1244 from Scenic Hills Elementary School on September 15, 2005. She took the gun to a crime scene analyst, who processed the weapon for fingerprints and did not recover any. Officer Milligan said the gun was clean

and free of rust. She said that she would have expected to see rust if it had been in the elements for two months.

Detective Eric Hutchison, of the Memphis Police Department, testified that he was assigned to the felony assault unit in July 2005. On July 15, 2005, he responded to a call at approximately 1:00 p.m. that there was a shooting victim at Pierotti Park. The victim was suffering from a gunshot wound to the head, and he was asking for his sister. Detective Hutchison did not have any other involvement in the case until he joined the homicide office in late August. He became the lead investigator on the case, taking over from Sergeant Jessica Burton. Detective Hutchison spoke with Nicholas Bedford and eliminated him as a suspect. He testified that the Raleigh Community Center did not have surveillance equipment and that Matthew Kinney was the only witness to the shooting.

He interviewed Mr. Kinney, who told him that he was walking home from the Raleigh Community Center when he heard a gunshot. Mr. Kinney looked towards the sound and saw two black males standing beside a car. The man with the gun drove away in a dark colored car, and the other man ran away. Mr. Kinney said the gunman had a tattoo that appeared to be a dragon on his right arm. Detective Hutchison testified that, in his opinion, the defendant's tattoo was consistent with Mr. Kinney's description. He said that Carnelious Cunningham did not have a tattoo on his upper arm.

Detective Hutchison examined the victim's cell phone records, which led him to talk to Cunningham. He determined that Cunningham lived at the end of the trail that the second person involved in the shooting ran down. Cunningham's phone records led him to speak with the defendant. Additionally, Cunningham's brother suggested that the detective speak with the defendant.

The defendant called Detective Hutchison on September 13, 2005. The defendant told him he suspected that Cunningham was responsible for the homicide, and they arranged for the defendant to go to the homicide office the following day. Detective Hutchison testified that Cunningham was in custody for the homicide at the time. The defendant admitted to calling Cunningham. Detective Hutchison said the calls were back-to-back "immediately after the shooting itself[,] and they were continuous throughout the night." The defendant told him that the calls were related to a trip to a shopping mall. Detective Hutchison told the defendant that they were going to detain him so they could put together a photospread to show the eyewitness.

When he took the defendant down to the jail, the defendant told him that he could provide the weapon that Cunningham used to kill the victim. The next day, Detective Hutchison and Sergeant Mason took the defendant to the school to search for the weapon.

Detective Hutchison testified that the defendant "was eager to go." The defendant first pointed them to an area by a softball field, and they unsuccessfully searched through leaves under the bleachers. They decided to leave, and as they were pulling out onto the street, the defendant asked them to search one more area. He pointed them to a wooded area, where he found the gun's magazine. Detective Hutchison testified that the defendant said he found it by luck and that the defendant was very familiar with the gun because he knew that one of the grips was missing before he saw the gun.

The defendant gave a formal statement that afternoon at the homicide office. Detective Hutchison also interviewed Cunningham again. After Cunningham gave a statement, Detective Hutchison told the defendant what Cunningham had said. Then, the defendant stated that he wanted to give another statement "because he wanted the opportunity to testify against [Cunningham] because [Cunningham was] the actual shooter and not him."

In his second statement, the defendant said that he and Cunningham planned to rob the victim. They arranged to meet the victim. Before the victim arrived, Cunningham hid in the woods with a gun while the defendant stayed in Cunningham's mother's black Camry. When the victim arrived, Cunningham walked up to the car and shot him in the back of the head. The defendant got out of the car, took the victim's marijuana and money, and ran away.

Detective Hutchison testified that the medical examiner's office removed a bullet from the victim. He took the bullet and the gun recovered from Scenic Hills Elementary School to the Tennessee Bureau of Investigation ("TBI") for comparison.

On cross-examination, Detective Hutchison testified that Casey Cunningham, Carnelious Cunningham's brother, arrived at the homicide office with the defendant on September 14. He interviewed Casey Cunningham because Carnelious Cunningham's phone records revealed numerous calls between the brothers around the time of the shooting, which Detective Hutchison considered suspicious. Detective Hutchison said "[he] cleared those up once [he] interviewed Casey Cunningham." Concerning Nicholas Bedford, Detective Hutchison said that Mr. Bedford provided an alibi witness, his child's grandmother. Detective Hutchison testified that he spoke by phone with the defendant's mother several times. He recalled telling her the last time she called that she should "get [her] son an attorney[;] he's going to be charged." Detective Hutchison said that he did not show Mr. Kinney a photograph of the defendant's tattoo. He testified that, contrary to his testimony during direct examination, the defendant did not make a written statement that Cunningham hid in the woods before shooting the victim, but he recalled the defendant saying that during an interview.

On re-direct examination, Detective Hutchison testified that the defendant gave several different versions of his story. On re-cross-examination, he said the defendant originally denied any involvement in the shooting.

Agent Teri Arney, a special agent forensic scientist with the TBI, testified that she compared the bullet recovered by the medical examiner from the victim's head to a bullet she fired through the weapon recovered by the Memphis Police Department in this case. She opined that the weapon fired the bullet recovered from the victim. She testified that the weapon was a forty-five caliber semi-automatic pistol manufactured by AMT. The pistol was missing one grip and the extractor. Because the pistol's extractor was missing, the pistol would not eject the cartridge case after firing a bullet. The operator would have to manually remove the cartridge case from the pistol's chamber.

Dr. Marco Ross, a medical examiner with the Shelby County Medical Examiner's Office, testified that the victim died from a gunshot wound to the back of his head. The bullet proceeded through his skull and brain and exited on the right side of his skull, lodging behind his right ear. Dr. Ross said that his office removed the bullet, photographed it, and sealed it in an envelope. He testified that the victim's toxicology report indicated the presence of marijuana but not alcohol or any other drugs. Dr. Ross opined that the gunman fired the pistol from a distance greater than three to four feet because there was no stippling around the wound.

The defendant testified that he was not present when the victim was killed. He did not recall anything specific that happened on July 15, 2005. The defendant said that he had known Carnelious Cunningham since the eighth grade, and they graduated together from Trezevant High School. The defendant testified that his cousin, Antonio, left a gun in his car, and Cunningham saw the gun in the backseat of the car several days before the victim was killed. Cunningham asked to borrow the gun, and the defendant said that he did not know what Cunningham intended to do with it. Days before the police arrested the defendant, Cunningham returned the gun to him and asked him to throw it away. He told the defendant that "he had robbed some old lady." He did not hide the gun at Scenic Hills Elementary School until the night before his appointment to speak with investigators. His friend, Chris Tucker, was with him when he hid the gun. He said he "was scared" because "[he] really didn't know nothing [sic], but all [he knew was that] this gun could have been involved in something." The defendant testified that Cunningham's brother told him that the police wanted to speak with him. According to him, the police told him that Cunningham explained that the phone calls between Cunningham and the defendant on July 15 were about their plans to go to a mall. He merely repeated Cunningham's explanation, as told to him by the police, in his written statement. The defendant and Cunningham learned through Chris

Tucker that the police were looking at Cunningham's phone records. Cunningham said that he would tell the police that "he used to buy weed from [the victim]."

On September 14, 2005, the defendant voluntarily went to the homicide office to speak with investigators. He testified that he waited in the lobby for thirty minutes before Sergeant Mason came out and saw his tattoo. The defendant identified a picture of his tattoo, which the court admitted as an exhibit. He described the tattoo on his right arm as "prayer hands with a chain and a cross hanging from it with [his] initials in it[,] and it say [sic] chosen one." It was a single color. He testified that he got the tattoo when he was sixteen, and he had done nothing to alter it. The defendant said he has never had a dragon or scorpion tattoo, and he did not have a tattoo on his left arm.

The defendant testified that Sergeant Mason put the defendant in an interview room and shackled his ankle to either the floor, a table, or a chair. He waited for "hours" until someone came in, and "they slam[med] they [sic] hands on the table[,]" demanding that he tell them what he knew. He told the officer that he did not know anything, even though he knew that Cunningham previously had the gun that the defendant hid. He asked the first officer he spoke to if he could speak with his mother.

When Detective Hutchison and Sergeant Mason came in, they told him he could not speak with his mother. He said, "[W]ell, get me a lawyer. I'm ready to go." They told him, "No. You ain't [sic] going nowhere [sic]" and that Cunningham said the defendant was responsible. When the officers took him to the jail to be booked, he told Detective Hutchison about the gun. Once he was in the jail, he called his mother. The next day, the officers took him to search for the gun. He could not remember on which side of the school he had thrown it away, which is why they searched both sides of the school. The defendant testified that neither of his statements to the police were the complete truth. He said he did not kill the victim, and he did not know for a fact that Cunningham killed him because he was not there.

Christy Williams, the defendant's mother, testified that Chris Tucker gave her Detective Hutchison's phone number on September 14, 2005. She called the detective several times that day until she was able to reach him. When she got through to the detective, she asked to speak with the defendant, but Detective Hutchison said that the defendant was there for questioning and that she could not speak with him. The defendant called her cell phone between 2:00 and 2:30 a.m. Ms. Williams went to the homicide office as soon as she got off work on the morning of September 15. Sergeant Mason told her that the defendant was just there for questioning and that "they didn't have anything on him," so he did not need a lawyer. She next spoke to Detective Hutchison. He told her that her son was over eighteen and had not asked to speak with her. He further said that she did not know what her son

might say before he left. When she told him, "[T]hat's coercion[,]" he replied, "[G]et a lawyer and prove it."

On cross-examination, Ms. Williams testified that she hired an attorney by the following Monday. On re-direct examination, Ms. Williams explained that the defendant's father provided the money to hire the attorney.

Following the close of proof and deliberations, the jury returned its verdicts finding the defendant not guilty of premeditated murder, but guilty of the lesser-included charge of reckless homicide, a Class D felony, and guilty of the lesser-included charge of facilitation of especially aggravated robbery, a Class B felony. The trial court sentenced him as a Range I standard offender to three years for reckless homicide and ten years for facilitation of especially aggravated robbery. The court ordered the defendant to serve the sentences concurrently in the Tennessee Department of Correction. The court denied the defendant's motion for new trial, and the defendant filed a timely notice of appeal.

**Analysis**

I. Sufficiency of the Evidence

On appeal, the defendant asserts that the evidence presented at trial was insufficient to support his convictions. Specifically, he argues that the state did not prove his guilt beyond a reasonable doubt because (1) the eyewitness identified two different individuals as being the person who ran away from the scene after the shooting; (2) the eyewitness's description of the shooter's tattoo did not match the defendant's tattoo; and (3) the defendant testified that the police coerced his statements.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value

to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

To sustain the defendant's conviction for reckless homicide, the state had to prove beyond a reasonable doubt that the defendant or one for whom the defendant was criminally responsible recklessly killed the victim. *See* Tenn. Code Ann. § 39-13-215(a).

> [A] person . . . acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

*Id.* § 39-11-302(c). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2). Criminal responsibility is not a separate crime but instead a theory by which the state may prove the defendant's guilt based upon another person's conduct. *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003).

To sustain his conviction for facilitation of especially aggravated robbery, the state had to prove beyond a reasonable doubt that the defendant knew that another person intended to commit an especially aggravated robbery and "knowingly furnishe[d] substantial assistance in the commission of" the especially aggravated robbery "but without the intent required for criminal responsibility under [Tennessee Code Annotated section] 39-11-402(2)." Tenn. Code Ann. § 39-11-403(a). An especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401(a), -403(a).

Viewing the evidence in a light most favorable to the state, the evidence showed that the defendant recklessly killed the victim and facilitated the especially aggravated robbery committed by Cunningham. The eyewitness, Matthew Kinney, identified Cunningham, not as the man who shot the victim, but as the man who ran away after the shooting.

Additionally, he described the shooter as having a tattoo on his upper right arm. According to the defendant's trial testimony, Cunningham implicated him as the shooter. Other trial testimony revealed that Cunningham did not have a tattoo on his upper right arm, while the defendant did. While Mr. Kinney's description of the gunman's tattoo did not match the defendant's tattoo, the jury saw the defendant's tattoo and were free to reach their own conclusions regarding the similarity. Sergeant Mason and Detective Hutchison testified that they did not coerce the defendant's statements. The defendant admitted in his second statement to police that he provided Cunningham with a weapon, that he was present when Cunningham robbed the victim, that he did not call an ambulance or stop to see if the victim was alive, and that Cunningham split the victim's money and marijuana with him. The forensics proved that the weapon provided by the defendant, and later hidden by the defendant, fired the bullet that struck the victim in the back of his head, resulting in his death. The jury resolved questions of credibility and conflicts in testimony in favor of the state. We conclude that the evidence was sufficient to support the defendant's convictions of reckless homicide and facilitation of especially aggravated robbery; therefore, the defendant is without relief as to this issue.

## II. Judicial Comments on the Evidence

For his second issue, the defendant argues that the trial judge made impermissible comments on the evidence. He contends that the trial judge committed reversible error by instructing the jury, during defense counsel's cross-examination of a witness and during the state's closing argument, concerning the admissibility and constitutionality of the statements given by the defendant to police. The state responds that the trial judge's instruction during cross-examination was permissible and did not amount to a comment on the evidence. The state further argues that the defendant waived his second assignment of error, the court's instructions during closing arguments, by failing to make a contemporaneous objection. We agree with the state that the court's instructions were not comments on the evidence but disagree that the defendant waived his second assignment of error.

The state constitution forbids judges from instructing juries on the facts of the case. Tenn. Const. art. VI, § 9 (stating that "[t]he [j]udges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law"). "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989). If the reviewing court finds that a trial judge made an improper comment on the evidence, then the court must consider whether the comment was prejudicial in the context of the case. *See Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 134 (Tenn. 2004).

The defendant assigns error to two interjections by the trial judge, during his cross-examination of Detective Hutchison and during the state's closing arguments. Before the first interjection, the defense counsel was questioning the detective about whether he recalled the defendant asking to speak to his mother. The prosecutor requested a bench conference, but the trial judge addressed the jury rather than holding a conference. The judge said,

> Ladies and gentlemen, let me say this to you. [Defense counsel] has every right and the State has every right to talk to this witness about statements that were taken.

> However, there is no question that these statements are admissible in evidence or were not taken in violation of Constitutional rights. If they were, then they would not . . . have been admitted into evidence.

> So any questions that are asked this officer by the State or the defense and any answers that he gives them about whether or not there was a mother who wanted to talk to her son or anything like that, are questions that you can use and circumstances you can use, to decide whether or not these statements were truthful or made by the defendant or were not made by the defendant or were not truthful if made by him.

> But you - - it's not going to be your business to go back in the jury room and decide whether or not you're going to consider evidence or find it unconstitutional because these statements have already been found to be Constitutionally taken.

> That's a legal decision that has to be made when we decide whether or not certain evidence is admitted. So, I'm trying not to involve myself in the lawsuit, but when you hear these questions and answers, you need to understand that you're going to have to decide as with all other evidence what weight to be given and the credibility, not only the credibility of the witnesses who testify to things, such as the officer, but also the credibility of any statements that are made.

The judge then read to the jury an instruction about prior statements of the defendant, which he later included in the jury charge that he gave before closing arguments. The judge continued by saying that he could not allow the jury to decide during deliberations that the defendant's statements were unconstitutionally obtained because he had previously ruled on the matter. He further said

-13-

And by telling you that, I'm not telling you that I believe any witness is credible or incredible or you should give more weight to one thing or another thing or that you give any weight at all to these two alleged statements . . . or that you give them a lot of weight or no weight.

During the state's closing arguments, the prosecutor said, "I will tell you, ladies and gentlemen, that [the defendant's statements] are not the product of coercion." Defense counsel objected and asked for a curative instruction regarding attorneys' opinions. The prosecutor requested that the court repeat its previous instructions about the constitutionality of the defendant's statements. The court then instructed the jury that the attorneys could discuss reasonable inferences that the jury could draw from the evidence but could not give their opinion. The court went on to discuss "jury nullification," saying that the suppression of evidence was a legal decision made by the court prior to trial and not a matter for jury consideration. The court concluded by saying that the admission of evidence was not a comment on the truthfulness of the statements, the credibility of witness, or the weight of the evidence.

Initially, we note that the defendant did not waive his second assignment of error by failing to contemporaneously object. It is well-settled that once an attorney has made an objection and the court has overruled it, an attorney need not make further exceptions regarding the same issue. *See Louisville & N.R. Co. v. Gower*, 3 S.W. 824, 826 (Tenn. 1887) ("One ruling on one question is enough, and a repetition of similar exceptions is not to be required, if, indeed, to be tolerated."); *Gulf Refining Co. v. Frazier*, 83 S.W.2d 285, 299 (Tenn. App. 1934). In this matter, the defendant's two assignments of error are sufficiently similar that defense counsel did not need to repeat his objection to the court's jury instruction to preserve the issue for appeal.

As for the merits of the defendant's argument, the trial court's comments were accurate statements of the law and not impermissible comments on the evidence. The trial judge, in essence, told the jury that he was responsible for determining the legal question of the admissibility of evidence while they were responsible for determining the credibility and weight of the evidence. The Tennessee Rules of Evidence entrust the trial judge to determine preliminary questions such as the admissibility of evidence. Tenn. R. Evid. 104(a). The trial court correctly stated that the jury determines the credibility of witnesses and the value and weight of evidence. *Bland*, 958 S.W.2d at 659; *see also Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). We conclude that the trial court's comments did not reflect on the weight or credibility of the evidence; therefore, the defendant's argument is without merit.

III. Denial of Full Probation

The defendant argues that the trial court abused its discretion by denying his request for full probation. He contends that his strong social history and lack of criminal history "outweigh experimental marijuana use and the crime itsself [sic]." The state responds that the defendant has not carried his burden of proving his suitability for full probation. We agree with the state.

At the sentencing hearing, the victim's mother testified that her son's death devastated her family and asked the court to impose the maximum sentence. The state introduced the defendant's presentence report, which the court admitted as evidence. The defendant presented character witnesses, including a former assistant principal, a secretary, and a teacher from Trezevant High School, who each testified that the defendant had been a peaceful, respectful student.

Patricia Innis, the mother of the defendant's girlfriend, testified that she had known the defendant for six and one-half years and considered him to be a peaceful, intelligent person. She said he had started college, and she had no objection to her daughter marrying him when they both finished college.

Shamira Innis, the defendant's girlfriend, testified that she had known the defendant since she was fourteen years old and did not believe he had a character of violence. She said that she believed the defendant would follow the rules of probation and that the defendant had support, including herself, to help him. Ms. Innis testified that she had not seen the defendant drink alcohol or use drugs.

The defendant's aunt testified to his good character and stated her belief that the presentence report's statement that the defendant was in a gang called J.U.B. was incorrect.

The defendant's mother testified that the authorities arrested the defendant for disorderly conduct when he was a freshman in high school. To her knowledge, her son was not in a gang.

The defendant testified that he was not in a gang. He said he was familiar with "Just Us Brothers" but explained that it was a group of young men, not a "criminal street gang." He said that he had completed one semester at Southwest Community College. He planned to graduate from college and marry his girlfriend.

The trial court found that the defendant was a Range I standard offender because he had a history of criminal behavior. Specifically, he had used marijuana since he was fifteen years old. The court found that the defendant's drug use was an enhancement factor applicable to both convictions, but the court gave the factor little weight. The court stated

that it had considered the statistical information, the presentence report, the arguments made by the parties, and the nature of the criminal conduct. The court found that the criminal conduct involved was "egregious." The court sentenced the defendant to ten years for facilitation of especially aggravated robbery and to three years for reckless homicide, in the Tennessee Department of Correction. Finding that the defendant was not a dangerous offender, the court ordered the sentences to run concurrently. The court denied the defendant's request for full probation, citing the circumstances of the criminal conduct, the defendant's lack of potential rehabilitation because of his untruthfulness, society's "interest in being protected from possible future criminal conduct of him, because of his involvement with guns and lies," and that full probation would depreciate the seriousness of the offense.

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate the defendant bears the burden of establishing that the sentence is improper. *Id.*, Sentencing Comm'n Comments. When the trial court follows the statutory sentencing procedure and gives due consideration and proper weight to the factors and principles relevant to sentencing, this court may not disturb the sentence. *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

A defendant is eligible for probation if the sentence received by the defendant is ten years or less, subject to some statutory exclusions. Tenn. Code Ann. § 40-35-303(a). A defendant with a total effective sentence in excess of ten years is eligible for probation if the individual sentences imposed for the convictions fall within the probation eligibility requirements. *See State v. Langston*, 708 S.W.2d 830, 832-33 (Tenn. 1986). A defendant seeking full probation bears the burden on appeal of showing the sentence imposed is improper, and that full probation will be in the best interest of the defendant and the public. *State v. Baker*, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997). The trial court's denial of probation is not subject to appellate review except for an abuse of discretion. *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974). A trial court abuses its discretion if there is no substantial evidence in the record to support its conclusion, in light of statutory criteria and decisions of the Tennessee Supreme Court. *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978).

In determining whether to grant or deny probation, a trial court should consider the circumstances of the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. *Grear*, 568 S.W.2d at 286; *State v. Boyd*, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995). The trial court should also consider the principles of sentencing outlined in Tennessee Code Annotated section 40-35-103, including the defendant's potential for rehabilitation.

The defendant's lack of credibility is also an appropriate consideration and reflects on a defendant's potential for rehabilitation. *State v. Nunley*, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103. Finally, when a sentence involves confinement, the court should consider the following:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

*Id.*

Probation may be denied based solely upon the circumstances surrounding the offense. *State v. Ring*, 56 S.W.3d 577, 586 (Tenn. Crim. App. 2001); *Hartley*, 818 S.W.2d at 374. However, the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree; and the nature of the offense must outweigh all factors favoring probation. *Hartley*, 818 S.W.2d at 374-75.

Here, the defendant is eligible for probation because his sentence is ten years. Because his sentence results from a Class B felony, however, he is not presumed to be a favorable candidate for alternative sentencing. Furthermore, as the defendant requested full probation, he bears the burden of establishing that the sentence imposed was improper.

In considering the defendant's request for full probation, the trial court discussed the defendant's good social history and lack of criminal history other than his drug use. The court expressed concern over the defendant's lack of potential rehabilitation and stated that society had an interest in being protected from his possible future criminal conduct. The court stated that the defendant was "a good liar" based on his testimony and statements to the police and that "he [had] his family fooled" because "even taking what [the defendant said as] true, in his second statement, he watched a young man be slaughtered and then didn't even call the ambulance, didn't even call a doctor." The court found that the fact that the

defendant had not previously been on probation mitigated in his favor, but that full probation would depreciate the seriousness of the offense.

In our view, the record contains substantial evidence to support the trial court's denial of full probation. The defendant contends that the trial court's finding that the defendant was untruthful was insufficient to support denial of probation. However, the defendant's truthfulness is probative of his potential for rehabilitation. *State v. Bunch*, 646 S.W.2d 158, 160-61 (Tenn. 1983); *Nunley*, 22 S.W.3d at 289. "The trial judge is in the best position to assess a defendant's credibility and potential for rehabilitation." *Nunley*, 22 S.W.3d at 289. Furthermore, the defendant's credibility was not the trial court's only consideration in its denial of full probation. The court found that the defendant's lack of potential for rehabilitation, the circumstances of the offense, and the risk of depreciating the seriousness of the offense outweighed the defendant's good social history and lack of criminal history. The defendant has not shown that the trial court abused its discretion. We conclude that the defendant failed to show that the sentence imposed was improper and that full probation would be in the best interest of the defendant and the public. *See Baker*, 966 S.W.2d at 434. Therefore, the defendant is without relief on this issue.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE